## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| _____ ) | |
| STATE OF NEW HAMPSHIRE ) | |
| DEPARTMENT OF ENVIRONMENTAL ) | |
| SERVICES ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil No. _____ |
| ) | |
| MCCORD CORP., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, the State of New Hampshire Department of Environmental Services ("Department"), by and through its attorney, the New Hampshire Office of the Attorney General (collectively, the "State of New Hampshire" or "State"), hereby files this complaint against Defendant McCord Corporation ("McCord") and alleges as follows:

## NATURE OF THE ACTION

1.      For many years, automobile parts were manufactured at the Collins & Aikman Plant (Former) Superfund Site located in Farmington, New Hampshire (the "Site").  Between the 1960s and 1970s, McCord operated the facility at the Site.  Specifically, McCord's manager of safety and ecology played a key role in decisions about waste management, environmental compliance, and plant expansion at the Site.  Moreover, McCord denied and later approved the construction of certain wastewater treatment features at the Site.

2.      The manufacturing process and plant design at the Site caused groundwater at the Site to be contaminated with volatile organic compounds ("VOCs").  *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 750 F. Supp. 1340, 1351 (E.D. Mich. 1990).

1

3.     The VOCs found in the groundwater at the Site can harm human health and the environment in a variety of different ways and are consequently designated hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA").

4.     The State brings this civil action against McCord under Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 & 9613 as well as New Hampshire Revised Statutes Annotated ch. 147-A and 147-B, to recover the costs the State has incurred by responding to releases and threatened releases of hazardous wastes and hazardous substances into the environment at or from the Site.  The State also seeks a declaratory judgment that McCord is liable for costs that the State will continue to incur by responding to and remediating the Site.

## JURISDICTION

5.     This Court has jurisdiction over the subject matter of this action and over the parties to this action.  42 U.S.C. §§ 9607 & 9613(b); 28 U.S.C. §§ 1331, 1345, and 1367.

6.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and Sections 106(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9606(a) & 9613(b), because the releases or threatened releases of hazardous substances that gave rise to this claim occurred in this district, and because the Site is located in this district.

## DEFENDANT

7.     Defendant McCord Corporation is incorporated under Michigan law.  McCord is hereinafter referred to as "McCord Michigan" or "McCord."

8.     Defendant McCord is currently headquartered in Troy, Michigan.

## STATUTORY BACKGROUND

9.      Congress enacted CERLCA in 1980 to provide a comprehensive governmental

mechanism for remediating hazardous substances and funding such remediation and related

enforcement activities, which are known as "response actions."  42 U.S.C. §§ 9604(a), 9601(25).

10.      Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the
> defenses set forth in subsection (b) of this Section… (2) any person who at
> the time of disposal of any hazardous substance owned or operated any
> facility at which such hazardous substances were disposed of,…shall be
> liable for (A) all costs of removal or remedial action incurred by the
> United States Government or a State or an Indian tribe…not inconsistent
> with the National Contingency Plan.

11.      In actions for cost recovery, Section 113(g)(2) of CERCLA requires the district

court to enter a declaratory judgment "on liability for response costs or damages that will be

binding on any subsequent action or actions to recover further response costs or damages."  42

U.S.C. § 9613(g)(2).

12.      New Hampshire Revised Statutes Annotated ch. 147-A, "Hazardous Waste

Management," and ch. 147-B, "Hazardous Waste Cleanup Fund," were both enacted in 1981.

13.      RSA 147-A:9 provides for strict liability of:

> any owner, operator, generator, or transporter who causes or suffers the
> treatment, storage, transportation or disposal of hazardous waste in
> violation of RSA 147-A or rules adopted or permits issued under RSA
> 147-A…[and] shall be strictly liable for costs directly or indirectly
> resulting from the violation relating to: (a) Containment of hazardous
> wastes; (b) Necessary cleanup and restoration of the site and the
> surrounding environment; and (c) Removal of the hazardous wastes.

14.      RSA 147-B:10, I provides, in pertinent part, that:

> [s]ubject only to the defenses set forth in RSA 147-B:10-a and the
> exclusions and limitations set forth in RSA 147-B:10, IV and V, any
> person who: (a) Owns or operates a facility; (b) Owned or operated a
> facility at the time hazardous waste or hazardous materials were disposed

3

there…shall be strictly liable for all costs incurred by the state in responding a release or threatened release of hazardous waste or hazardous material at or from the facility as specified in paragraph II.

15.     RSA 147-B:10, II continues that:

[c]osts recoverable by the state under paragraph I shall include all costs relating to: (a) Containment of the hazardous wastes or hazardous materials. (b) Necessary cleanup and restoration of the site and the surrounding environment. (c) Removal of the hazardous wastes or hazardous materials. (d) Such actions as may be necessary to monitor, assess and evaluate the release or threat of release of a hazardous waste or hazardous material; or to mitigate damage to the public health or welfare that may otherwise result from a release or threat of release.

16.     Under CERCLA, an "owner or operator" of an onshore facility is "any person owning or operating such facility."  42 U.S.C. § 9601(20)(A)(ii).

17.     The Supreme Court of the United States has explained that in the context of CERCLA, "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998).  This theory of direct liability is distinct from derivative operator liability whereby a parent company can be liable for the actions of a subsidiary under a theory of veil piercing.  *Id*. at 64-65.

18.     In *Bestfoods*, the Court recognized a number of circumstances in which a parent company can be liable as an operator under CERCLA:

[(1)] when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture;…[(2) when] a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility…[and (3) when] an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility.

*Id*. at 71.

4

## GENERAL ALLEGATIONS

### Description and History of the Site

19.     The Site includes two parcels located south of New Hampshire Route 11: (i) a 96.34-acre parcel located on Davidson Drive, identified by the Town of Farmington Tax Assessor's office as Map R31, Lot 34; and (ii) a 10-acre parcel located at 56 Davidson Drive, identified by the Town of Farmington Tax Assessor's office as Map R36, Lot 2.  Collectively, these parcels are referred to as the former Collins and Aikman Automotive Interiors, Inc. property.

20.     The Site also includes approximately 166 acres affected by the Site-related groundwater contaminate plume, and extends across the north side of Route 11.  The affected area north of Route 11 is roughly bounded by NH Route 11, NH Route 53 (Main Street) to the east, and Pokamoonshine Brook to the north/northwest.

21.     From at least 1966 to approximately 2006, Davidson Rubber Company, Inc. ("Davidson Rubber") manufactured instrument panels, bumpers, fascias, and other automobile parts at a plant located at the Site (hereinafter referred to as "the Farmington Plant").

22.     Manufacturing processes conducted at the Farmington Plant included polyurethane foam molding; construction, washing, and painting of polyvinyl chloride ("PVC") shells, and assembly of finished parts.

23.     Solvents used at the Farmington Plant included acetone, isopropyl alcohol, methylene chloride, methyl isobutyl ketone, methyl ethyl ketone, tetrachloroethene (also called perchlorethylene, or "PCE"), toluene, trichloroethene ("TCE"), and xylene.

24.     Waste generated during manufacturing operations at the Farmington Plant, included, without limitation, the following:

5

    a.   Sludge from vapor degreasing process in which PCE was used to remove oil from metal structural inserts;

    b.   Waste plastisol[1] generated from the manufacture of PVC shells;

    c.   Paint waste, including toluene, xylene, and methyl ethyl ketone, generated by cleaning paint equipment;

    d.   Soapy liquid and solid waste from washing processes;

    e.   Methylene chloride used to flush urethane foam-making nozzles;

    f.   Still bottoms from distilling foam and methylene chloride to reclaim methylene chloride;

    g.   Solvent-soaked rags used to wipe off vinyl shells; and

    h.   Vinyl and urethane scraps.

25.    At various times, wastewater from the manufacturing processes at the Farmington Plant discharged into an unnamed tributary of the Pokamoonshine Brook; over the ground at the northern end of the Farmington Plant; into a percolating lagoon at the Plant; and into the ground via a sewage disposal system with a leach field.

26.    As of at least 1990, groundwater at the Site was known to contain dichloroethylene, methylene chloride, PCE, TCE, toluene, and vinyl chloride. *Fireman's Fund*, 750 F. Supp. at 1345.

27.    Dichloroethylene is produced from the breakdown of PCE and TCE.

28.    Investigations in the late 2010s and 2020s have demonstrated that chromium, perfluorooctanoic acid ("PFOA"), and perfluorooctane sulfonate ("PFOS") are also in the Site's groundwater.

---

[1] Plastisol is a liquid suspension of PVC used to manufacture automobile dashboard shells at the Farmington Plant.

29.     In July 2012, EPA completed a Hazard Ranking System evaluation, and with the

Department's support, proposed the Site for inclusion on the EPA's National Priorities List.

30.     In 2013, EPA listed the Site on the National Priorities List.

31.     In December 2014, EPA began a Remedial Investigation for the Site in

coordination with the Department.  Ongoing Remedial Investigation activities include extensive

soil, groundwater, and surface water sampling to evaluate the contamination.  Future work

involves additional data collection necessary to create a Feasibility Study to evaluate remedial

alternatives prior to the publication of a Record of Decision, and oversight work, among other

things.

<u>**Corporate History of Defendant**</u>

32.     As of at least 1964, McCord Corporation was incorporated under the laws of the

State of Maine (hereinafter, "McCord Maine").

33.     In 1964, McCord Maine entered into a *Plan and Agreement of Reorganization*

with Davidson Rubber Company, Inc., incorporated in New Hampshire.

34.     Under that plan, McCord Maine purchased substantially all assets and assumed

substantially all of the liabilities of Davidson Rubber Company, Inc., incorporated in New

Hampshire, including the Farmington Plant.

35.     As a result of the 1964 *Plan and Agreement of Reorganization*, Davidson Rubber

Company, Inc., as incorporated in New Hampshire was reorganized as Davidson Rubber, Inc.,

organized under Delaware law and is the entity referred to in Paragraph 21.

36.     As of at least 1966, Davidson Rubber owned and operated the Farmington Plant.

37.     Davidson Rubber's corporate letterhead and internal memos in the early 1970s

identified "Davidson Rubber, Inc." as a "Division of McCord."

38.     In 1974, Davidson Rubber sent a letter to EPA Region 1 about a pending environmental permit on letterhead labeled, "Davidson Rubber Company Incorporated…a Division of McCord."

39.     McCord Maine's annual shareholder reports from the mid-1960s and 1970s listed "Davidson Rubber Inc." as a "division" of McCord Maine.

40.     In the 1970s, Davidson Rubber was publicly held out as a division of McCord Maine.

41.     As of at least 1977, Ex-Cell-O Corp., a Michigan corporation ("Ex-Cell-O"), organized XLO, Inc., also a Michigan corporation, as a wholly owned subsidiary.

42.     Through a 1977 *Agreement and Plan of Merger* McCord Maine, including Davidson Rubber, merged with and into XLO, Inc. and XLO, Inc. became the surviving entity.

43.     In 1978, XLO, Inc. was renamed McCord Corporation.  This corporation is the same entity defined in Paragraph 7 as "McCord Michigan."

44.     McCord Michigan is the successor in interest to McCord Maine per the 1977 *Agreement and Plan of Merger*.

45.     Starting in 1986, Ex-Cell-O was liquidated, and its subsidiary McCord Michigan (including Davidson Rubber), and other assets and liabilities of Ex-Cell-O, were transferred to other entities.

46.     In 1987, Davidson Rubber was renamed Davidson Textron, Inc., which was later renamed Textron Automotive Interiors, Inc. in 1995.

47.     In 2001, Collins and Aikman Products Company purchased Textron Automotive Interiors, Inc., which was renamed Collins and Aikman Automotive Interiors, Inc.

48.     In 2005, Collins and Aikman Corporation filed for bankruptcy for itself and its subsidiary companies, including Collins and Aikman Automotive Interiors, Inc.

**McCord's Operations and Decisions Regarding Waste Handling at the Farmington Plant**

49.     As of 1964, Mr. Robert Birch ("Birch") was an assistant chief engineer at Davidson Rubber.

50.     In 1971, Birch became the manager of safety and ecology for McCord Maine.

51.     As the manager of safety and ecology for McCord Maine, Birch worked with McCord's "divisions on ways to reduce or eliminate any air, water[,] or noise pollution that McCord manufacturing plants may generate."

52.     As of at least 1971, Birch worked out of McCord Maine's headquarters in Detroit, Michigan.

53.     In July 1971, the average daily flow of effluent from the Farmington Plant was approximately 60,000 gallons.

54.     By at least December 1971, effluent from plant operations drained into a culvert beginning at a parking lot at the southern end of the Farmington Plant, which drained into an unnamed tributary of the Pokamoonshine Brook.  This culvert is identified as the South Storm Sewer on Figure 1.

55.     In November 1971, after reviewing Farmington Plant data, Birch directed five actions that "should be done on a crash basis" to address the effluent draining into Pokamoonshine Brook.

56.     Four of the actions as directed by Birch were implemented at the Farmington Plant.

57.     The fifth action directed by Birch as referenced in Paragraph 55 was not implemented after determining that it was infeasible.

58.     By at least 1971, Birch and certain managers of Davidson Rubber expressed concern that polluted runoff from the South Storm Sewer at the Farmington Plant into Pokamoonshine Brook could create a potential problem for Davidson Rubber and the Farmington Plant from both a legal and community relations standpoint.

59.     In 1971, Birch suggested investigating whether a retention lagoon could treat the runoff from the Farmington Plant.

60.     In 1972, Birch reviewed and commented on a proposal submitted by Davidson Rubber's environmental consultant to address runoff from the Farmington Plant.

61.     As of at least May 1973, officials from the Town of Farmington and Farmington Village Precinct reported discolored water exiting from the Farmington Plant.

62.     On information and belief, in May 1973, to avoid the discharge of "illegal waste water" into Pokamoonshine Brook, Davidson Rubber requested an appropriation from McCord Maine to redirect the wastewater on the northern end of the Farmington Plant.

63.     Wastewater on the northern end of the Farmington Plant was redirected to the North Storm Sewer shown on Figure 1.

64.     The redirected wastewater described in Paragraph 62 was described as "unsightly," "malodorous," and an "attractive nuisance."

65.     In July 1973, Birch issued a memorandum to all McCord facilities, including the Farmington Plant, directing certain operational changes to help ensure timely compliance with the newly elected federal Water Pollution Control Act, passed in October of 1972 (otherwise known as the Clean Water Act).

10

66.     In August 1973, Davidson Rubber sent an appropriations request to McCord Maine to complete an engineering study to build a wastewater treatment facility, with an alternatives analysis, to address water pollution concerns at the Farmington Plant.

67.     McCord Maine deferred Davidson Rubber's 1973 appropriations request for the engineering study to build a wastewater treatment facility at the Farmington Plant.

68.     In or about April 1974, Birch inspected the Farmington Plant and its continued water pollution discharge from the North Storm Sewer outfall.

69.     In an April 17, 1974 memo, entitled "Farmington Water Problem," and labeled "McCord Intra-Company Correspondence," Birch wrote:

> This water is impounded briefly, where suspended PVA[2] agglomerates and floats to the surface, creating a foul waste with very poor visual characteristics, being milky in appearance and leaving any grass and shrubbery in its path blackened and dead.
> …
> The community problems that would be raised by general knowledge of such a waste stream and the concomitant poor publicity resulting certainly behoove us to take immediate action to control this condition…. We are and have been in violation of the law by not applying for an EPA Discharge Permit for this waste.

70.     In the April 17, 1974 memo referenced in Paragraph 69, Birch made several recommendations to address the water pollution problem at the Farmington Plant, including seeking an appropriations request for water conservation studies.  Birch stated that he would "see that [the appropriation request] does not get hung up in Detroit," the location of McCord Maine's headquarters.

71.     In May 1974, Davidson Rubber submitted an appropriations request to McCord Maine that included a proposal to evaluate different alternatives for addressing wastewater at the Farmington Plant.

---

[2] Polyvinyl alcohol, also known as PVA, was used at the Farmington Plant.

72.     In a memorandum discussing the May 1974 appropriations request, a Davidson

Rubber employee wrote that "[t]his program has been reviewed with Dick Birch on two

occasions this past year and had his endorsement as indicated in his correspondence of 4-17-74."

73.     In June 1974, Birch received copies of wastewater treatment study schedules to

implement his proposed course of action to address the wastewater discharge problem from the

North Storm Sewer at the Farmington Plant.

74.     On July 26, 1974, Davidson Rubber's consultant finalized a Preliminary

Engineering Report, summarizing its analysis of alternatives for addressing the wastewater

discharge from the North Storm Sewer.

75.     The July 26, 1974 report referenced in Paragraph 74, which included a lagoon

system to percolate contaminated wastewater into the ground, noted the lagoon system was more

cost-effective than the other options analyzed, but could cause groundwater contamination.

76.     On August 14, 1974, a Plant manager submitted an appropriations request and

accompanying memorandum to build the lagoon system.

77.     By 1975, the lagoon system was built, and North Storm Sewer outlet effluent

rerouted to it.

78.     On information and belief, McCord Maine approved the appropriations request to

construct the lagoon system at the Farmington Plant.

79.     Memos regarding concerns about water pollution from the Farmington Plant were

on letterhead that described Davidson Rubber as a "division of McCord [Maine]."

80.     In February 1974, Birch directly communicated by telephone with EPA to request

reduced sampling requirements under Davidson Rubber's 1974 permit application to discharge

runoff from the Farmington Plant to Pokamoonshine Brook under the National Pollutant
Discharge Elimination System ("NPDES").

81.     Birch received copies of water quality monitoring reports sent by the Farmington
Plant to EPA in accordance with the Farmington Plant's NPDES Permit.

82.     In 1977, Birch directly managed the expansion of the Plant's main building,
including the construction of a sewage waste disposal system with a leach field for the expanded
building.

83.     The Remedial Investigation for the Site identified septic leach fields as a source
of contamination on the Site.

### **Insurance Litigation**

84.     In or about 1985, Ex-Cell-O, McCord Michigan, and Davidson Rubber
(collectively, the "Policyholders") sought a declaratory judgment against various insurance
carriers regarding coverage for environmental contamination at the Farmington Plant and at other
facilities.  *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 750 F. Supp. 1340 (E.D. Mich. 1990).

85.     The insurance policies at issue in the *Fireman's Fund* litigation were issued to
McCord and named Davidson Rubber as an additional named insured.  *Fireman's Fund Ins.*, 750
F. Supp. at 1344.

86.     The insurance policies at issue in the *Fireman's Fund* litigation obligated the
insurance carriers to indemnify the Policyholders for property damage caused by an occurrence,
which was defined in the policies as an "accident, including continuous or repeated exposure to
conditions, which results, during the policy period, in…property damage neither expected nor
intended from the standpoint of the insured…." *Id*. at 1345 (ellipses in original).

87.     In holding that the insurance carriers were not obligated to indemnify the

Policyholders, the district court found:

> The design and operation of the Farmington Plant facilitated disposal of
> hazardous liquid waste directly into the environment.  Davidson [Rubber]
> made various modifications to its operation over the years.,  Initially,
> waste water was discharged into the Pokamoonshine Brook tributary, then
> onto the north end of the [Farmington Plant], and later into the lagoon
> system.  Consistent, however, throughout these changes was
> [P]olicyholders' direct discharge of contaminants into the environment.

*Fireman's Fund Ins.*, 750 F. Supp. at 1345.

## SPECIFIC ALLEGATIONS

88.     McCord Maine was a "person" as defined by CERCLA. 42 U.S.C. § 9601(21).

89.     McCord Maine was a "person" as defined by N.H. RSA 147-A:2, XII and N.H.

RSA 147-B:2, IX.

90.     McCord Michigan is a "person" as defined by CERCLA. 42 U.S.C. § 9601(21).

91.     McCord Michigan is a "person" as defined by N.H. RSA 147-A:2, XII and N.H.

RSA 147-B:2, IX.

92.     McCord Maine operated Davidson Rubber as a division of McCord Maine.

93.     McCord Maine managed, directed, or conducted operations related to the leakage

or disposal of hazardous substances, hazardous wastes, and/or hazardous materials at the

Farmington Plant.

94.     McCord Maine made decisions about waste disposal and compliance with

environmental regulations at the Farmington Plant.

95.     McCord Maine operated the Farmington Plant.

96.     McCord Maine operated the Farmington Plant at the time of disposal of hazardous

substances, hazardous wastes, and/or hazardous materials at the Farmington Plant.

97.     McCord Michigan is the successor-in-interest to McCord Maine for McCord Maine's CERCLA, N.H. RSA 147-A, and N.H. RSA 147-B liabilities associated with the Farmington Plant.

98.     The Farmington Plant is a "facility" as defined by CERCLA.  42 U.S.C. § 9601(9).

99.     The Farmington Plant is a "facility" as defined by N.H. RSA 147-A:2, IV and RSA 147-B:2, III.

100.    Among other chemicals, PCE, TCE, dichloroethylene, toluene, and methylene chloride were disposed of at the Farmington Plant at least between 1966 and 1977.

101.    PCE, TCE, dichloroethylene, toluene, and methylene chloride are "hazardous substances" and "hazardous wastes" as defined by CERCLA and N.H. RSA 147-A and N.H. RSA 147-B and administrative rules.  42 U.S.C. § 9601(14); 40 C.F.R. § 302.4; N.H. RSA 147-A:2, VII; and N.H. RSA 147-B:2, VII.

102.    The State of New Hampshire Department of Environmental Services has incurred at least $166,000 in response costs at the Site that have not been reimbursed.

103.    The unreimbursed response costs referenced in Paragraph 102 are not inconsistent with the National Contingency Plan promulgated under CERCLA Section 105, 42 U.S.C. § 9605, and codified at 40 C.F.R. Part 300.

### **CLAIM FOR RELIEF**

### **Cost Recovery under CERCLA Section 107, N.H. RSA 147-A, and N.H. RSA 147-B**

104.    The State re-alleges paragraphs 1-103 above as if fully set forth herein.

105.    McCord Michigan is a person, or a successor-in-interest to a person, who at the time of disposal of hazardous substances and/or hazardous wastes operated the Farmington Plant,

which is a facility from which there was a release or threatened release of hazardous substances/hazardous wastes.

106.    In response to the release or threatened release of hazardous substances and/or hazardous wastes, the State of New Hampshire Department of Environmental Services has incurred costs that are not inconsistent with the National Contingency Plan promulgated under CERCLA Section 105, 42 U.S.C. § 9605, and codified at 40 C.F.R. Part 300.  The State expects that it will incur additional response costs in connection with the Farmington Plant.

107.    Under Section 107(a)(2), N.H. RSA 147-A:9, and N.H. RSA 147-B:10, I-II, McCord Michigan is jointly and strictly liable to the State for all costs incurred and to be incurred by the State in connection with the Site, including enforcement costs and interest on all costs.

108.    In accordance with Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), and pursuant to N.H. RSA 147-A and N.H. RSA 147-B, the State is entitled to declaratory judgment that McCord Michigan is jointly and severally liable to the State for future response costs to be incurred by the State in connection with the Site.

## **RELIEF REQUESTED**

Wherefore, Plaintiff, the State of New Hampshire, respectfully requests that the Court grant the following relief:

A.    Enter judgment in favor of the State holding Defendant jointly and severally liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), N.H. RSA 147-A:9, and N.H. RSA 147-B:10, I-II, for unreimbursed response costs incurred by the State relating to the Site, including enforcement costs and prejudgment interest;

B.      Enter a declaratory judgment on Defendant's liability that will be binding on any

subsequent action for further response costs, pursuant to Section 113(g)(2) of

CERCLA, 42 U.S.C. § 9613(g)(2), N.H. RSA 147-A, and N.H. RSA 147-B; and

C.      Grant such other relief as the Court deems just and proper.


                                        Respectfully submitted,

                                        STATE OF NEW HAMPSHIRE
                                        DEPARTMENT OF ENVIRONMENTAL
                                        SERVICES

                                        By and through its attorney,

                                        JOHN M. FORMELLA
                                        ATTORNEY GENERAL


DATE: August 12, 2022_____             /s/ Joshua Harrison_____
                                        Joshua C. Harrison, Bar #269564
                                        Assistant Attorney General
                                        Environmental Protection Bureau
                                        Office of the Attorney General
                                        New Hampshire Department of Justice
                                        33 Capitol Street
                                        Concord, New Hampshire 03301-6397
                                        Joshua.C.Harrison@doj.nh.gov
                                        (603) 271-3679



Figure 1

Collins & Aikman (Former)
Plant Site

Farmington, New Hampshire

Drawn By: E. Wright
Designed By: S. Nemey
Reviewed By: C. Crocetti
Project No: 3856.10
Date: January 2022

**Figure Narrative**

This Figure is derived from Figure 1.1 of the Work Scope for Phase 3 RI Activities for the Collins & Aikman (Former) Plant Site, available at https://semspub.epa.gov/work/01/100010557.pdf.

To Pokamoonshine Brook

North Storm Sewer

1977

Northwest Septic System Leachfields

Henry Wilson Highway (Route 11)

South Storm Sewer

Unnamed Tributary

Davidson Drive

Infiltration Basins/Lagoon System

Feet
90  45  0    90    180

SANBORN ||| HEAD